# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60726-CIV-DIMITROULEAS/ROSENBAUM

MAUREEN MORGAN,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of
Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

### *I.  INTRODUCTION*

This matter is before the Court on the cross-motions for summary judgment filed, respectively, by Plaintiff Maureen Morgan ("Claimant") and by Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner").  The motions were referred to me pursuant to 28 U.S.C. § 636 and Magistrate Rules 1(c) and (d), Local Rules of the United States District Court for the Southern District of Florida. [D.E. 7].

The cross-motions present the following issue: whether substantial evidence exists to support the determination by the Administrative Law Judge ("ALJ") that Claimant is not disabled under the Social Security Act and retains the residual functional capacity to perform a full range of light work and, therefore, to return to her past relevant work as an optometric assistant.  Under the limited standard of review that governs this case, I recommend a finding that substantial evidence  supports the ALJ's determination.  Thus, Plaintiff's Motion for Summary Judgment [D.E. 8, 13] should be

denied, Defendant's Motion for Summary Judgment [D.E. 11] should be granted, and the Commissioner's decision should be affirmed.

## II.  PROCEDURAL HISTORY

Claimant filed an application for disability insurance benefits on May 29, 2003, under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401, *et seq.* (Tr. 15, 50, 55).  Claimant allegedly became disabled as of November 11, 1999, due to, as stated in her Disability Report, nerve and back damage. (Tr. 55).  The Social Security Administration ("SSA" or "Administration") denied the applications initially and upon reconsideration.  (Tr. 15).

Thereafter, Claimant requested and was granted a hearing before an Administrative Law Judge ("ALJ").  On March 24, 2005, in Fort Lauderdale, Florida, Claimant appeared before Administrative Law Judge M. Dwight Evans and testified to her impairments. (Tr. 237).  On July 29, 2005, the ALJ issued a decision finding that Claimant retains the ability to perform light work, including her past relevant work as an optometrist's assistant. (Tr. 17-25).  Accordingly, the ALJ concluded that Claimant is not under a "disability" as defined in the Social Security Act. (Tr. 24-25).

Claimant later requested review by the Appeals Council of the unfavorable ALJ decision and submitted additional evidence in support of her claim.  On April 6, 2007, the Appeals Council denied Claimant's request for review, thereby allowing the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 4-6).

On May 23, 2007, Claimant filed this Complaint [D.E. 1] seeking reversal of the Commissioner's final decision, and the Commissioner filed an Answer on July 19, 2007, [D.E. 4]. After the Court issued an Order setting Briefing Schedule, Claimant filed her Motion for Judgment on the Pleadings [D.E. 8], the Commissioner filed his Motion for Summary Judgment [D.E. 11], and

Claimant later filed her Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment. [D.E. 13].  This matter is, therefore, ripe for disposition.

### III.  FACTS

#### A.     General Background

Claimant was born on October 3, 1945, and was 54 years old at the time of the onset of her claimed disability. (Tr. 50).  Claimant is not currently working.  She has past relevant work experience, however, as an optometric assistant, which involved typing letters, handling billing for customers and vendors, and adjusting patients' eye glasses and contact lenses. (Tr. 56).  Claimant alleges that she has not been able to work since November 11, 1999, due to physical ailments resulting from an automobile crash occurring on that date.[1] (Tr. 55-56).  More specifically, she alleges that she suffers from nerve and back damage, and the resulting pain has prevented her from sitting or standing for any reasonable length of time. (Tr. 55).

#### B.     Medical Evidence/Treating Physicians

Claimant has been treated and evaluated by various doctors and, thus, for simplification of the evidence relating to Claimant's medical condition, Claimant's physicians' findings will be set forth below, primarily in chronological order.

##### 1.   Treating Physicians Philip Averbuch, M.D.; Martin Lesser, M.D.; Anthony Hall

Orthopedic specialist Dr. Philip Averbuch examined Claimant initially on December 3, 1999, noting her complaints of increasing pain since being involved in a motor vehicle accident on

---

[1]    At the time of the accident, Claimant was traveling as a passenger in a pick-up truck when an adjacent  tractor-trailer blew a tire causing the rubber to come off and strike the window next to which Claimant was sitting.  Claimant recoiled and jerked to the left, but did not lose consciousness.  Claimant did not receive medical attention at the time of the accident.  (Tr. 89).

November 11, 1999. (Tr. 89).  Claimant's appointment with Dr. Averbuch was the first time she had sought medical attention since her accident.  *Id.*  During this initial examination, Claimant reported burning pain in her ribs, as well as pain in her back which radiated into her left leg.  *Id.*  Claimant stated that she had previously taken over-the-counter Advil with moderate success.  *Id.*  Dr. Averbuch's exam revealed tenderness in the left costal margin laterally and pain with motion.  *Id.* He also found that Claimant's range of motion was full and that her sensory and motor function in both legs was normal.  *Id.*  Additionally, his exam revealed tenderness in the left sciatic notch and low back area, as well as paravertebral spasms.  *Id.*  An X-ray of Claimant's ribs and spine did not show any change or fracture, dislocation, or subluxation.  *Id.*  Dr. Averbuch's impression was that Claimant suffered from multiple contusions with low back and sciatic pain.  He then recommended physical therapy, ice, and prescribed Norgesic Forte.[2] *Id.*

Later that month, based upon a referral from Dr. Averbuch, Claimant saw neurologist Dr. Martin Lesser in relation to her complaints of pain, foot numbness, and a burning sensation in her feet. (Tr. 103).  Upon examination, Dr. Lesser found Claimant to have normal strength and tone, although she was a bit hypersensitive over her left thigh. (Tr. 102).  Claimant's reflexes were found to be brisk throughout, with flexor (healthy) plantar responses, normal position sense in both lower extremities, and normal gait. *Id.*  Motor examination and sensory testing revealed some blunting of pinprick up to Claimant's T6 level on her left side.  (Tr. 103).  Dr. Lesser was concerned about Claimant's discomfort in her thoracic area and ordered an MRI to rule out the possibility of a herniated disc. (Tr. 101-102).

---

[2]     Norgesic Forte is a medication comprised of aspirin, caffeine, and orphenadrine and is used to help relax certain muscles in the body and relieve the pain and discomfort caused by strains, sprains, or other injury to muscles. *See* www.drugs.com/cons/norgesic-forte.

Upon re-visiting Dr. Averbuch on December 22, 1999, Claimant reported less swelling, but indicated that she continued to experience numbness across her abdomen and waist. (Tr. 88).  Dr. Averbuch noted that physical therapy was helping Claimant a great deal. *Id.*  During this second visit, Dr. Averbuch found tenderness in Claimant's dorsal and upper lumbar spine with spasm present.  *Id.*  He also found that Claimant had a full range of motion, but she experienced pain on flexion.  *Id.*  He suggested that Claimant continue her therapy, exercise, and ice. *Id.*

After Claimant underwent two MRIs, Dr. Lesser again saw Claimant on January 7, 2000. (Tr. 100).  Dr. Lesser found Claimant's symptoms to be slightly improved, but noted that Claimant indicated that she still experienced burning in the thoracic area and numbness in the rectal area. *Id.* Dr. Lesser found Claimant's MRI films taken on December 23, 1999, and December 30, 1999, to be unimpressive, remarking that he did 'not clearly understand the etiology of her complaints" based on the location of her symptoms.  *Id.* In fact, Dr. Lesser wrote to Dr. Averbuch that he was "having difficulty explaining her symptoms based on the MRI scans which essentially look unremarkable to me except for a small herniated disc at T11-T12 on the left side," but that would not explain Claimant's symptoms.  (Tr. 99).  Dr. Lesser indicated that he wondered about the possibility of demyelinating disease or a cord contusion, but noted that he had no evidence of either. (Tr. 99-100). In addition, he prescribed Neurontin[3] and ordered an additional MRI.  *Id.*

Claimant returned to Dr. Averbuch on January 14, 2000, and reported that therapy was helping her a great deal. (Tr. 87).  Claimant did, however, complain of continued burning in her feet. Claimant explained that she did not take the Neurontin as prescribed by Dr. Lesser because she had

---

[3]    Neurontin is a medication originally developed for the treatment of epilepsy. Currently, it is widely used to relieve pain, especially neuropathic pain.  *See* http://en.wikipedia.org/wiki/Neurontin.

the flu, causing her to take other medications for her flu symptoms. *Id.* Dr. Averbuch reviewed the MRI films ordered by Dr. Lesser and reiterated that they showed a herniated disc at T11-12. Dr. Averbuch's physical examination of Claimant revealed tenderness in the mid-dorsal and low back area with spasm. *Id.* At this time, Claimant's range of motion was reasonably full, but painful. *Id.* Dr. Averbuch recommended continued therapy and exercise, and advised Claimant to begin taking the Neurontin medication. *Id.* At Claimant's next visit, she reported that she was taking Neurontin, which provided her some relief. (Tr. 86). Dr. Averbuch also felt that the physical therapy was helping Claimant. *Id.*

On February 8, 2000, Claimant complained to Dr. Lesser of numbness in her feet, but stated that it had improved. (Tr. 97). She also remarked that she still had numbness around the left thoracic area, but that had improved as well. *Id.* Claimant reported that she had been taking Neurontin at night which seemed to help her. *Id.* Dr. Lesser reviewed Claimant's additional MRI scan of the thoracic area taken on January 19, 2000, and saw nothing unusual, including no evidence of a herniated thoracic disc or cord contusion. *Id.* He opined that from his review of the history of the accident, Claimant apparently had the seatbelt tightly around her waist and wondered whether or not she had some type of minimal contusion injury to the thoracic cord. *Id.* In addition, Dr. Lesser found Claimant's reflexes to be brisk in the lower extremities, and found a normal gait with no difficulty walking. *Id.* He recommended Claimant continue with therapy under Dr. Averbuch's direction, noted that she was clinically improved, and was satisfied with no further testing. *Id.*

Claimant followed up with Dr. Averbuch and on March 2, 2000, reported that she felt that she was getting better, but that she still had swelling and burning in both feet. (Tr. 85). An examination revealed tenderness in the mid and low back area, with spasm. *Id.* Dr. Averbuch found

Claimant's range of motion to be 80 percent of normal in flexion and extension, and painful.  *Id.*
Claimant's sensory and motor functions were normal in both lower extremities.  *Id.*  Dr. Averbuch
again suggested continuing therapy, exercise, ice, and that Claimant return in three weeks.  *Id.*

When Claimant returned to see Dr. Lesser on March 21, 2000, he remarked that the clinical
picture was again peculiar to him, and it did not make sense to conclude that Claimant had a cord
contusion causing her injuries. (Tr. 95).  Although Dr. Lesser reported Claimant was about 80
percent better, he noted that she still had a number of complaints, including burning of her feet in
the lower extremities. *Id.*  He remarked that Claimant was able to ambulate better and that her
reported rectal numbness was better. *Id.*  Dr. Lesser noted Claimant's gait was unremarkable and
there was blunting of pinprick from about T6 down the left side compared to the right in her
abdominal region. *Id.*  He recommended that Claimant return for electromyogram ("EMG")[4] testing
of the lower extremities. *Id.*  Once the EMG tests were completed, Dr. Lesser found that the MRI
of the thoracic spine and brain revealed no abnormalities.  (Tr. 94).  Dr. Lesser then recommended
Claimant be sent for a second neurological opinion. *Id.*

On May 12, 2000, Dr. Averbuch noted that Claimant had normal EMG results and a normal
CT scan.  (Tr. 84).  At this time, Claimant reported that she was walking in the pool for exercise,
although she was still getting some stiffness in her back. *Id.*  Dr. Averbuch noted that swelling had
diminished in the thoracic area, but Claimant had not returned to work.  *Id.*  An examination of
Claimant revealed tenderness in the dorsal and lumbar spine with a good range of motion. *Id.*  Dr.
Averbuch suggested she continue the current regimen. *Id.*  Over one month later, on June 16, 2000,

_____

[4]    An EMG is a test that is used to record electrical activity of muscles.  EMGs can
detect abnormal muscle electrical activity that can occur in many diseases and conditions such as
disc herniation and others.  *See* www.medicinenet.com/electromyogram/article.

Claimant reported to Dr. Averbuch that she was still exercising in the pool daily and taking Elavil.[5] (Tr. 83). She reported that although she still had left sciatic pain and burning in her feet, her symptoms were not as severe as they had been previously. *Id.* Dr. Averbuch observed full range of motion with pain on flexion, and noted Claimant was neurologically intact. *Id.*

On July 27, 2000, Claimant saw neurologist Dr. Anthony Hall for a neurological consultative examination, since Dr. Lesser had recommended that Claimant obtain a second opinion. (Tr. 79). During her visit, Claimant explained to Dr. Hall that she began experiencing pain approximately a week after she was involved in a motor vehicle collision. *Id.* She complained of left flank pain coming diagonally to the rectum anteriorly and posteriorly, as well as pain posteriorly in her legs to her toes. *Id.* Claimant indicated that the left flank pain was the worst and rated it 3-4 out of 10. *Id.* She reported doing home and pool exercises as therapy. *Id.* Claimant also reported that her walking tolerance was 300 yards, her sitting tolerance was 20 minutes, and her standing tolerance was not affected. *Id.* In addition, she was taking Elavil daily and Xanax 0.25mg as needed. *Id.*

Upon examination, Dr. Hall described Claimant as a healthy-appearing mildly obese female in mild distress with normal extremities. *Id.* Dr. Hall observed that Claimant had a normal gait, including the ability to walk and stand on her heels and toes. (Tr. 80). Dr. Hall found tenderness in the thoracic and lumbar regions upon spinal examination. *Id.* Claimant's cervical spine range of

---

[5]   Elavil is an antidepressant medication used to treat a variety of conditions, including depression and other mental/mood disorders. *See* www.webmd.com/drugs/drug-1807-Elavil+Oral. Claimant received routine heath care from general practitioner, Mitchell Goldstein, D.O., through July 17, 2001. (Tr. 113-143). With respect to the injury she suffered as a result of her car accident, Claimant saw Dr. Goldstein on March 28, 2000, at which time he prescribed Elavil. On March 16, 2001, Claimant reported that the burning sensation in her legs was much improved with Elavil. *Id.*

motion was full, but lumbar spine range of motion was somewhat limited with pain. *Id.*  A motor examination revealed normal tone throughout, as well as normal strength testing for ten out of ten muscle groups tested.  *Id.*  Dr. Hall reviewed Claimant's December 23, 1999, thoracic MRI, December 30, 1999, lumbar MRI, and January19, 2000, thoracic MRI.  He noted that the December 23rd thoracic MRI revealed mild dessication, the December 30th lumbar MRI showed herniated discs at L3-4 and L5-S1, and the January 19th thoracic MRI was essentially normal.  (Tr. 81).  Dr. Hall's impression was myofacial syndrome of the lumbar and thoracic region, and a herniated nucleus pulposus at L3-L4 and L5-S1. *Id.*  According to Dr. Hall, Claimant had reached maximum medical improvement with a 10 percent impairment of the person as a whole.  *Id*.  Dr. Hall recommended Claimant undergo weight training, conditioning, and flexibility training.  *Id.*  Dr. Hall stated that Claimant might consider surgery for L5-S1 and L3-L4 if she did not improve. *Id.*

Medical records from Dr. Averbuch dated July 28, 2000, indicate that Claimant returned due to continued discomfort in the low back and left sciatic notch area. (Tr. 82). She also reported burning in her feet and limitation in her walking capacity.  *Id.*  Claimant further reported taking Elavil and doing her exercises. *Id.*  Physical examination revealed tenderness in the low back, more marked on the left side, with mild spasm present. *Id.*  Dr. Averbuch found Claimant's sensory and motor functions, as well as her gait, to be normal.  *Id.*  Dr. Averbuch concluded that Claimant had reached maximum medical improvement, with a permanent partial impairment of 8 to 10 percent of the body related to the injury. *Id.*  He recommended that Claimant continue exercise and ice. *Id.*

When Claimant returned to see Dr. Lesser for the last time on October 6, 2000, Claimant had mild weakness proximally in the left lower extremity.  (Tr. 93).  Dr. Lesser stated that Claimant had signs and symptoms consistent with an injury to the thoracic spine.  (Tr. 90).  Claimant was no

longer taking Neurontin and, instead, taking Elavil at bedtime.  *Id.*  Dr. Lesser opined that Claimant was somewhat limited in doing housework, since she was unable to vacuum for more than several minutes.  (Tr. 93).  At that time, Dr. Lesser believed that Claimant had reached maximum medical improvement.  (Tr. 90).

### 2.      Treating Physician Bridget Silva, M.D.

Claimant was under the care of family practitioner Dr. Bridget Silva beginning in August of 2001, for general health care.[6]  Claimant first saw Dr. Bridget Silva on August 30, 2001, during which visit Claimant explained that she experienced left leg numbness, burning in her feet and legs, and pain in her feet that prevented her from sleeping.  (Tr. 162).  Claimant also reported that she was unable to work, and was taking Xanax and Elavil.  *Id.*  Dr. Silva provided Claimant with a trial of Celexa[7] in an attempt to address Claimant's neuropathy.  *Id.*  Records from a follow-up visit on September 13, 2001, indicate that Claimant continued to suffer from burning pains.  Claimant's lab tests, however, were normal.  (Tr. 161).  The treatment records further reveal that Claimant's neuropathy was of unknown etiology.  *Id.*  It also appears that in discussing a future protocol for Claimant, Dr. Silva noted various side effects that Claimant experienced when taking prior medications.  (Tr. 162).  On October 10, 2001, Dr. Silva provided Claimant with a trial dose of Wellbutrin for her anxiety and chronic pain.  (Tr. 159).  Claimant reported on December 3, 2001, however, that she had stopped taking the Wellbutrin.  (Tr. 160).  Because Claimant continued to complain of anxiety, chronic pain, and burning in her feet, Dr. Silva discussed non-narcotic treatment

---

[6]      The record indicates Claimant visited Dr. Silva a total of four times within the insured period (*i.e.*, from August of 2001 through the end of December, 2001).

[7]      Celexa is an antidepressant drug used to treat major depression associated with mood disorders as well as anxiety.  *See* http://en.wikipedia.org/wiki/Celexa.

with Claimant. *Id.*

Various records show that Claimant continued to see Dr. Silva on occasion **after her date of last insured, December 31, 2001**. At a visit on January 7, 2002, Claimant told Dr. Silva that she had tried to do volunteer work, but could not do so due to pain. (Tr. 158). However, Claimant did state that she was walking for 20 minutes on a treadmill. *Id.* During the course of other later visits with Dr. Silva there are consistent notes regarding Claimant's gynecological health, her cholesterol levels, anxiety and neuropathy, and continuous refills of Xanax to help Claimant sleep. (Tr. 155-186). Dr. Silva also discussed with Claimant the fact that there was no cure for her, but that taking Xanax[8] would help her with her pain. (Tr. 155). Dr. Silva later prescribed Neurontin for Claimant's neuropathy, which dosage was later increased. (Tr. 235, 220).

Dr. Silva completed a Lumbar Spine Residual Functional Capacity ("RFC") Assessment on November 19, 2003, which was submitted to the ALJ on March 21, 2005. (Tr. 203-210). Among Claimant's symptoms, Dr. Silva identified the following: painful and numb left trunk, painful and numb left thigh, pain in both feet with numbness and burning, disequilibrium, uncoordinated gait, sensitivity to underclothing, anxiety, neuropathy, and sleep problems. (Tr. 204). When describing pain, Dr. Silva noted Claimant experienced continuous left trunk pain, as well as pain and numbness in Claimant's lower extremities which interfered with her sleep, made her anxious, and made it painful to wear clothing. (Tr. 205). Dr. Silva identified a reduced range of motion from a straight-leg raising test, abnormal gait, sensory loss, tenderness, swelling of the feet, muscle atrophy of the buttocks, and impaired sleep. *Id.* She further opined that Claimant could walk one block with pain,

---

[8]    The record reveals that Claimant has been taking the same dose of Xanax since she was in her 20s, well before the accident occurred. (Tr. 153).

sit continuously for 20 minutes, stand for 10 minutes, and stand/walk for less than 2 hours in an 8-hour work day.  (Tr. 207-208).  Additionally, Dr. Silva indicated that during an 8-hour work day, Claimant would need to take a break every 15-20 minutes to get up and walk for two minutes.  (Tr. 208).  Dr, Silva also indicated that Claimant's legs would need not be elevated with prolonged sitting. *Id.*  As for Claimant's abilities to lift and carry, Dr. Silva opined that Claimant could lift and carry less than 10 pounds occasionally, but never more, and that Claimant had significant limitations in doing repetitive reaching, handling or fingering. (Tr. 209)  It is significant to note, however, that Dr. Silva's RFC was completed after the date of last insured.

### 3.     Ambroise Forte, M.D. (Consultative Examination)

Claimant saw Dr. Ambroise Forte for a consultative disability examination on August 12, 2003, pursuant to a referral by the Division of Disability Determinations. ("DDD").  (Tr. 144). During her examination, Claimant complained of pain in the mid back and burning on her left side, as well as lack of full control of her left leg.  *Id.*  She claimed that her feet burned and reported that she had constant lower back pain.  *Id.*  Also, Claimant stated she could not use a bra or other undergarment due to pain, and did not use a back brace. *Id.*  In addition, she stated she could not wear shoes because of burning on the back of her heels.  *Id.*  Claimant reported that she could not tolerate standing for more than 20 minutes, sitting more than 10-15 minutes, and that after walking 20 feet she was forced to stop and rest.  *Id.*  Although Claimant did not use a cane, she advised that she usually held on to someone for support.  *Id.*  At the time, Claimant was taking Lipitor, Xanax, and Ibuprofen.  *Id.*  Claimant had never had any steroid injections or epidural blocks.

Dr. Forte reported that Claimant's bones cracked when she bent and squatted, noting she walked with a slight left-sided limp. (Tr. 146).  He noted that walking on her heels and toes, bending,

and squatting caused lower back pain. *Id.*  In addition, Dr. Forte found that Claimant could button

and unbutton, and zip and unzip her clothes. *Id.*  She could also turn the knob of a door to close or

open it without difficulty. *Id.*  Physical examination revealed no spinal deformity or spina-bifida. (Tr.

147).  Likewise, Dr. Forte found no spinal or paraspinal tenderness, but did find tenderness in the

left lower rib area. *Id.*  There was no evidence of muscle atrophy or dystrophy, no pedal edema, and

no joint swelling or tenderness in the extremities.  (Tr. 148).  Dr. Forte found that Claimant's

cervical spine and all of her joints of the extremities reached full and satisfactory range of motion.

*Id.*  At full range, however, Claimant complained that the motion of the thoraco-lumbar spine was

painful. *Id.*

Dr. Forte assessed Claimant as suffering from post thoracic disk bulge at T10-T-11 and

small left paracentral disk protrusion at T11-T12 with minimal impression upon the thecal sac. *Id.*

Dr. Forte also noted the results of the three MRIs performed by Claimant's other doctors. *Id.*

Ultimately, Dr. Forte found that Claimant suffered from chronic lower back pain with bilateral

lumbar radiculopathy. *Id.*

**C.**    **Non-Examining Physicians/Residual Functional Capacity Assessments**

**1.**    **I.B. Price, M.D.**

Dr. I.B. Price reviewed Claimant's medical history and completed a Residual Functional

Capacity ("RFC") Assessment on September 3, 2003. (Tr. 195-202).  Dr. Price concluded Claimant

could occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry 10 pounds. (Tr.

196).  Dr. Price further concluded that Claimant could stand and/or walk for approximately 6 hours

in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday. *Id.*  Claimant's

ability to push and pull, in Dr. Price's opinion, was unlimited, other than as shown for lifting and/or

carrying. *Id.*  Dr. Price cited specific facts in Claimant's medical records such as the various MRIs performed, as well as Claimant's doctors' diagnoses to support these conclusions.  *Id.*

      **2.**      **R. Jenifer Peckoo-Williams, M.D.**

      Dr. R. Jenifer Peckoo-Williams also reviewed Claimant's medical history and completed a RFC Assessment on October 2, 2003, in connection with Claimant's application for SSI benefits. (Tr. 187-194).  Based on her consideration of Claimant's medical history, Dr. Peckoo-Williams concluded that Claimant could occasionally lift and/or carry up to 50 pounds and frequently lift 25 pounds. (Tr. 188).  As for Claimant's ability to stand, walk, and sit, Dr. Peckoo-Williams determined that Claimant could stand and/or walk for approximately 6 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday. *Id.*   To support these residual functional capacity assessments, Dr. Peckoo-Williams pointed to Claimant's specific medical records and diagnoses. (Tr. 188-189).

**D.**    <u>**Claimant's Testimony Before the ALJ**</u>

      Claimant appeared and testified at an administrative hearing held before the ALJ on March 24, 2005. (Tr. 237-264).  Claimant stated that she was 59 years old and was born on October 3, 1945. (Tr. 242).  She testified she had a valid driver's license without any restrictions and that she owned a car. *Id.*  Claimant completed high school, but she did not attend college or a vocational school.  (Tr. 244). With regard to her employment history, Claimant stated that she worked as a receptionist and optometric assistant for approximately twenty years.  (Tr. 245-246).  Claimant later owned a hot dog stand in Pennsylvania for six months, but while moving to Florida was involved in the car accident that she claims caused her allegedly disabling condition.  (Tr. 247).  Claimant has not worked since her accident in November of 1999.

During the hearing, Claimant testified that her feet burned constantly and that she had terrific pain in her back. (Tr. 249). She also stated that she had chronic pain in her left leg which prevented it from operating at full capacity. *Id.* Claimant added that she could not step up onto a curb with her left leg and that she stubbed her feet constantly. (Tr. 249-250). She described the frequency of her pain as constant. *Id.* When asked to rate the intensity of the pain she experienced on a daily basis on a scale from one to ten, with ten being the most intense, Claimant responded that when she was taking medication, the pain level was about a five to six, and a seven or eight when she was not taking medication. *Id.* Claimant testified she was taking Neurontin, a prescription drug, and over-the-counter Ibuprofen. *Id.* She also testified she had previously taken Elavil and was currently taking Xanax, both to reduce the burning sensation in her feet. (Tr. 251). When asked if the Nuerontin or Xanax helped relieve pain, she responded that the Neurontin helped her back pain a little bit. *Id.* Claimant, however, went on to testify that no prescriptions provided relief for the burning in her feet except Xanax, which tended to make her nerves calm down a little bit. *Id.*

She stated that she was unable to sleep through the night due to the position in which she had to lie in bed (*i.e.*, with her feet up in the air and two pillows behind her head to accommodate the pain). (Tr. 252-253). Additionally, Claimant stated that the burning in her feet prevented her from obtaining any restful sleep. (Tr. 253). Claimant testified that she could stand for perhaps ten to fifteen minutes, after which she would experience terrible pains in her back, requiring her to lie on the couch with her legs propped up. (Tr. 254). Claimant also testified that she could endure, at most, twenty minutes of sitting, after which point she must lie down. *Id.* Claimant further stated that she could probably walk a block with a cane, but it was unlikely she could walk further due to balance issues. (Tr. 259-260). When asked how much she could lift, Claimant stated that she could not lift

-15-

a gallon of milk.  (Tr. 260).  Moreover, Claimant testified that she was not able to bend or squat

without pain. (Tr. 261).

  With respect to Claimant's daily activities, Claimant stated that she lives with her boyfriend,

who is primarily responsible for household chores.  (Tr. 259).  She explained that after she wakes

up, she serves herself a glass of prune juice.  (Tr. 256).  Later in the day, Claimant washes her face,

combs her hair and then goes to eat lunch.  (Tr. 257).  For the remainder of the day, Claimant

primarily watches television.  (Tr. 258).  Claimant explained that although she tried doing volunteer

work at her grandson's school, she did so only once because the pain in her back and burning in her

feet were too great to allow her to continue. (Tr. 247-248). Claimant confirmed that she attended

physical therapy for approximately one year and that the therapy helped the feeling in her legs and

her back. (Tr. 255).  Claimant also testified that one of her doctors discussed back surgery with her,

but explained that it was up to her how much pain she could stand before making such a decision.

(Tr. 262).

### E. The ALJ's Decision

  The ALJ rendered his decision on July 29, 2005.  (Tr. 15-25).  After evaluating the entire

record, the ALJ found that Claimant did not have a disability as defined under the Social Security

Act and was not entitled to disability benefits.  *Id.*  Specifically, the ALJ determined that Claimant

suffered from chronic lower back pain with bilateral lumbar radiculopathy and high cholesterol, an

impairment or combination of impairments considered "severe" based on the requirements set forth

in 20 CFR § 404.1520(b).  (Tr. 24).  However, these severe impairments did not meet or medically

equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4.  *Id.*  Based on a

review of the evidence, the ALJ found that Claimant had the residual functional capacity to perform

a full range of light work (*i.e.*, work that requires lifting 20 pounds at a time, sitting up for up to six hours in an 8-hour day, and standing and/or walking on and off for approximately six hours in an eight-hour day). *Id.* In making his determination, the ALJ found that Claimant's allegations regarding her limitations were not credible, and that she had the ability to return to her prior work as an optometrist's assistant, secretary, and receptionist, because as customarily performed, they did not require the performance of work-related activities precluded by Claimant's residual functional capacity. *Id.*

### IV.   STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, this Court's role is a limited one. *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983). The Commissioner's findings of fact must be affirmed if they are supported by "substantial evidence.*" Id.*; *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971). "Substantial evidence" is more than a scintilla of evidence but less than a preponderance and is such relevant evidence that a reasonable person might accept as adequate to support the challenged conclusion. *Id.* at 401, 91 S.Ct. at 1427; *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir. 1982). The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Bloodsworth*, 703 F.2d at 1239. The scope of review is limited to an examination of the record only. *Reynolds v. Secretary of HHS*, 707 F.2d 927 (6th Cir. 1983). If the ALJ's decision is supported by substantial evidence, the reviewing court must affirm the decision. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, the court must determine whether the ALJ properly applied the correct legal standards. *Wiggins v. Schweiker*, 679 F.2d 1387,

1389 (11th Cir. 1982).

## V.  ANALYSIS

### A.    The Sequential Evaluation and Its Application by the ALJ

Initially, a claimant has the burden of establishing that he or she is disabled under the Social Security Act.  *Walden*, 672 F.2d at 838;  *Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10th Cir. 1991). A "disability" is defined as an inability . . .

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  In determining the merits of a claim for benefits, the court must consider the evidence as a whole, including: 1) objective medical facts or clinical findings; 2) diagnoses of examining physicians; 3) subjective evidence of pain and disability as testified to by the claimant and corroborated by other witnesses; and 4) the claimant's age, education, and work history. *Walden*, 672 F.2d at 839.  Here, Claimant must establish that she was disabled on or prior to December 31, 2001, her date of last insured.

*Step One.*  To arrive at a determination as to disability, the ALJ must undertake the five-step sequential evaluation embodied in 20 C.F.R. § 404.1520.  This process requires that the ALJ first determine whether the claimant is presently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  If so, a finding of "no disability" is made.  If the claimant is not engaged in such activity, then the ALJ must proceed to the second step of the sequential evaluation.

As a threshold matter, the ALJ determined that Claimant met the disability insured status requirements of the Social Security Act on November 11, 1999, the alleged onset date, and was

-18-

insured **through December 31, 2001.** (Tr. 16).  The ALJ then applied the facts, as he found them, to the sequential evaluation framework.  At Step One, he found that Claimant had not engaged in substantial gainful activity since her alleged onset date. *Id.*

     *Step Two.*  At the second step, the ALJ must determine whether the claimant suffers from a "severe impairment" or combination of impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  If the ALJ concludes that none of the claimant's impairments are medically severe, the ALJ will consequently find that the claimant is not disabled; if, however, the ALJ concludes that the claimant's impairments are medically severe, then the ALJ will proceed to the next phase of the analysis.  *Id.*  Here, the ALJ found that Claimant's chronic lower back pain with bilateral lumbar radiculopathy and high cholesterol constituted a severe impairment within the meaning of the Regulations. (Tr. 17).

     *Step Three.*  The third step requires the ALJ to consider the "medical severity of [the claimant's] impairments" in order to determine whether the claimant's impairment meets or equals those listed in Appendix I of the Regulations.  20 C.F.R. § 404.1520(d).  Although the list is too voluminous to set forth here, the listings help to identify those claimants whose medical impairments are so severe that it is likely that they would be found disabled regardless of their vocational background.  *Bowen v. Yuckert*, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297 (1987).  If the ALJ concludes that the impairments meet or equal one of those listed and meet the duration requirement, the ALJ will find the claimant disabled without considering age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(iii) & (d).  If not, the inquiry will proceed to the next stage.

     In this case, the ALJ determined that Claimant did not have an impairment or combination

of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 17). Accordingly, to find Claimant disabled he needed to proceed to the next step in the analysis.

*Step Four.* This step requires that the ALJ determine whether the claimant has the "residual functional capacity" to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The Regulations define "residual functional capacity" ("RFC") as what an individual can still do despite any limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a). This determination takes into account "all relevant evidence," including the medical evidence, the claimant's own testimony, and the observations of others. *Id.* The ALJ must then compare the RFC to the demands of the previous employment to determine whether the claimant is still capable of performing that kind of work. If so, the ALJ will conclude that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv) & (f).

Here, the ALJ assessed Claimant's residual functional capacity to perform relevant work, and in doing so considered Claimant's subjective complaints as well as her treating physicians' medical records, the consultative examiner's records, and the two non-examining physicians' Residual Functional Capacity Assessments. In reviewing the evidence, however, the ALJ, found that Claimant's subjective complaints were not credible to the extent alleged. (Tr. 22). The ALJ also determined that Claimant's allegations of total disability were not consistent with and were disproportionate to the record as a whole. *Id.*

Based upon his review of the entire record, including treating physician records and opinions of State Agency medical consultants, the ALJ found that Claimant retains the residual functional

-20-

capacity to perform the full range of "light work,"[9] or work which involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects up to ten pounds. (Tr. 23). Therefore, the ALJ determined that Claimant could return to her past relevant work as an optometrist's assistant, secretary, and receptionist. *Id.*   Accordingly, the ALJ concluded that Claimant is not under a "disability," as defined in the Social Security Act. (Tr. 24). The ALJ, consequently, did not proceed to Step Five of the analysis.[10]

**B.**     **The ALJ's Decision is Supported by Substantial Evidence**

Here, Claimant disputes the findings and conclusions of the ALJ, arguing that the ALJ improperly rejected her treating physician Dr. Silva's medical opinion. Claimant further contends that the ALJ incorrectly evaluated Claimant's claim at step four of the sequential evaluation by finding that Claimant could perform light work and, therefore, could return to her past work as an

---

[9]   "Light work" is defined as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing – the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls. Social Security Ruling 83-10, 1983 WL 31251, at *5-6 (S.S.A. 1983).

[10]   Had the ALJ determined that Claimant could not continue to perform her past relevant work, at Step Five the burden would have shifted to the Commissioner to demonstrate that there exists other substantial gainful employment in the national economy that a claimant can perform. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *Smith v. Schweiker*, 646 F.2d 1075, 1077 (5th Cir. 1981). If the Commissioner proffers possible alternative employment, the burden returns to a claimant to prove an inability to perform those jobs. *Id.* The ALJ must then resolve whether the claimant is actually capable of performing other gainful and substantial work within the economy. 20 C.F.R. § 404.1520(f). Essentially, the ALJ must determine if there is other work available in significant numbers in the national economy that the claimant has the ability to perform. If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled. If the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant is disabled.

-21-

optometrist's assistant.  In essence, Claimant asserts that the ALJ's decision that Claimant is capable of performing light work is unsupported by the record.  Finally, Claimant contends that the ALJ improperly discounted Claimant's testimony regarding her subjective complaints of pain.

###    1.    Weight Afforded to Dr. Silva's Opinion and RFC Determination

Claimant argues that the ALJ improperly rejected the medical opinion of one of her treating physicians, Dr. Bridget Silva, particularly Dr. Silva's RFC Assessment dated November 19, 2003. Claimant is correct that the regulations generally require that an ALJ give more weight to the opinion of a treating source.  *See* 20 C.F.R. § 404.1527(d)(2).  In evaluating the testimony of a treating source, an ALJ should consider the specialization of the physician, the frequency of examinations, the evidence offered in support of the opinion, and the consistency of the opinion with the record as a whole.  20 C.F.R.§ 404.1527(d).  The opinion of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary.  *Lewis v. Callahan*, 125 F.3d 1436 (11th Cir. 1997) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).

"Good cause" not to give the opinion of a treating physician substantial or considerable weight has been found to exist when (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).  When the ALJ declines to accord the opinion of a treating physician substantial or considerable weight, "[t]he ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  *Lewis*, 125 F.3d at 1440.  "However, when an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision

-22-

will stand." *Wright v. Barnhart*, 2005 WL 2888189, at *5 (11th Cir. Nov. 3, 2005) (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)).

First, it is significant to note that Dr. Silva's RFC Assessment upon which Claimant relies to establish her disability was dated November 19, 2003, almost two years **after** the date of last insured. (Tr. 22, 204-210). The ALJ specifically noted this fact and further emphasized that although Dr. Silva referred to an earlier period, the RFC was not received in the record until March 22, 2005. (Tr. 22). Due to the fact that the RFC was completed nearly two years after the date of last insured and it was at best, unclear whether the opinion related back to the applicable time period, the ALJ had sufficient reason to discount it. Claimant must prove the existence of a disability as defined by the Act on or before the day on which her insured status expired. *See* 20 C.F.R. § 404.320; *See Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981), *cert. denied*. As the Commissioner noted, when a claimant is no longer insured for Title II purposes, medical evidence of his or her condition will only be considered as of the date that the individual was last insured. *See Long v. Chater*, 108 F.3d 185 (8th Cir. 1997). If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied, despite her disability. *See, e. g., Kirkland v. Weinberger*, 480 F. 2d 46 (5th Cir. 1973), *cert. denied*; *Chance v. Califano*, 574 F. 2d 274 (5th Cir. 1978).

Next, even assuming that Dr. Silva's RFC Assessment was completed prior to the date of last insured or it was clear that it related back to the time frame before the date of last insured, the severe limitations indicated in the RFC are inconsistent with other medical records, including Dr. Silva's own treatment records. (Tr. 20, 148-62). Thus, there was good cause to accord less weight to the opinion of treating physician Dr. Silva. Good cause exists to discount a treating physician's report

where it is not accompanied by objective medical evidence or is wholly conclusory. *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

Here the record does not support the presence of the severe limitations listed in Dr. Silva's RFC (*i.e.*, inability to walk more than one block, lift less than 10 pounds, and pain severe enough to constantly interfere with attention and concentration). Indeed, conspicuously absent from the records of the two neurologists and the orthopedist that treated Claimant for an extended period of time are indications of such conclusions. Instead, during her treatment with these other physicians, the doctors continually pursued rather conservative treatment methods, such as ice, exercise, flexibility training, and relatively mild medications. (Tr. 89). Additionally, although Claimant complained of back pain, the medical tests performed did not comport with Claimant's complaints. For example, when Claimant first saw Dr. Averbuch, an X-ray of Claimant's ribs and spine did not show any change or fracture, dislocation, or subluxation. *Id.* Similarly, when Claimant saw her doctor a few weeks later, he noted normal strength and tone and a normal gait. (Tr. 102). Claimant also reported on a number of occasions that physical therapy was helping a great deal. (Tr. 85, 86, 88).

Additionally, when Dr. Lesser reviewed Claimant's MRI films taken on December 23, 1999, and December 30, 1999, although they indicated a herniated disc at the T11-T12 level, he found them to be unimpressive and remarked that he did "not clearly understand the etiology of her complaints" based on the location of her symptoms. (Tr. 100). Dr. Lesser also noted to Dr. Averbuch that he was "having difficulty explaining [Claimant's] symptoms based on the MRI scans." (Tr. 99). Although Dr. Lesser wondered about the possibility of a cord contusion, after taking an additional MRI, he later indicated that he saw nothing unusual, including evidence of a

-24-

herniated thoracic disc or a cord contusion. (Tr. 97). At that time, Dr. Lesser noted that Claimant was "clinically improved" and was satisfied that further testing was not necessary. *Id.*

Over the course of her treatment, Claimant also stated that the numbness in her feet had improved, and, although she still had burning in her feet, Claimant felt that she was getting better. (Tr. 85). Each time she appeared for an examination with Dr. Averbuch and Dr. Lesser, they suggested that she continue therapy, exercise, and ice. And when Claimant saw Dr. Lesser in March of 2000, he reiterated that the clinical picture was peculiar to him. (Tr. 95). When he recommended EMG testing of the lower extremities, he found no abnormalities. (Tr. 94). At this time, and in June of 2000, Claimant reported that she was walking in the pool for exercise. (Tr. 84, 83).

Even when Claimant saw neurologist Dr. Anthony Hall in late July of 2000 for a second opinion, he concluded that Claimant was in mild distress with normal extremities. (Tr. 79). He noted that Claimant had a normal gait, including the ability to walk and stand on her heels and toes. (Tr. 80). Dr. Hall concluded that Claimant had reached maximum medical improvement ("MMI") with a 10 percent impairment of the person as a whole. (Tr. 81). Like Drs. Averbuch and Lesser, Dr. Hall, based on his evaluation of Claimant, recommended that she undergo weight training, conditioning, and flexibility training. *Id.* And, although Dr. Hall mentioned that Claimant might consider surgery if she did not improve, such surgery was not pursued and the record does not indicate that any further discussion regarding surgery took place. *Id.* When Claimant saw Dr. Averbuch on July 28, 2000, he agreed that Claimant had reached MMI with a partial impairment of 8 to 10 percent of the body related to the injury. (Tr. 82).

All of these records by specialized treating physicians, whom Claimant saw over a period of time, do not support the opinions of family practitioner Dr. Silva as set forth in her RFC. Indeed,

Dr. Silva's RFC is not consistent with the record as a whole or her own treatment records. Even Dr. Silva noted that Claimant's neuropoathy was of unknown etiology when she saw her in September of 2001 (just three months prior to the date of last insured). (Tr. 161). Nothing in Dr. Silva's medical records comports with the severe limitations listed in her RFC. Significantly, as of December of 2001, she discussed non-narcotic treatment with Claimant. (Tr. 160). Even looking at Dr. Silva's records after the date of last insured does not lend support to her ultimate RFC conclusions. For example, as of January of 2002, Claimant reported that she was walking on the treadmill for 20 minutes. (Tr. 158).

Ultimately, there was good cause not to give Dr. Silva's opinion substantial weight because her opinion was not bolstered by the evidence. To the contrary, the evidence supports a contrary finding. Likewise, good cause exists to discount Dr. Silva's opinion announced in the RFC because it is also inconsistent with her own medical records. See *Jones v. Dept. of Health & Human Services*, 941 F.2d 1529, 1532-33 (11th Cir. 1991) (good cause exists to disregard the opinions of doctors where the doctor's opinions are conclusory or inconsistent with their own medical records). Here, the ALJ's determination is supported by substantial evidence and comports with the proper legal standards.

_____Claimant further argues that the ALJ concluded, based on the evidence of record and testimony, that Claimant was capable of performing a full range of light work, including past relevant work as an optometrist's assistant. (Tr. 23). Claimant argues that the Commissioner "ignored all the substantial evidence before him and instead substituted his own judgment for that of all the doctors," and failed to provide a rationale supported by substantial evidence as required by the Regulations. (D.E. 13, p. 18). However, the ALJ's determination that Claimant retained the

RFC to return to her past relevant work as an optometrist's assistant is supported in the record by substantial evidence. The ALJ found that Claimant could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for up to six hours during an eight-hour day, and sit for up to two hours during an eight-hour day. (Tr. 23). This conclusion is also supported by the Physical Residual Functional Capacity Assessment completed by reviewing physician Dr. I.B. Price on September 2, 2003, and by evidence in the record relating to Claimant's condition in the relevant time period, through December 31, 2001. The ALJ acknowledged that the opinions of reviewing physicians are not initially accorded substantial weight, but found that in this case they were consistent with the medical evidence of record as a whole in regard to the Claimant's ability to do light work activities. (Tr. 22). Therefore, the ALJ accorded Dr. Price's conclusions substantial weight.

State Agency examining physician Dr. Peckoo-Williams also completed a RFC Assessment that was in harmony with Dr. Price's. Both RFCs cited to Claimant's medical history in the record and concluded that Claimant was not precluded from light work activities. The ALJ relied specifically on these RFCs in making his own determination and found that they were consistent with the medical evidence of record as a whole. *Id.* The reasons articulated by the ALJ, including the medical evidence of record and documented successes of treatment measures as previously discussed, suffice to support a finding of light work.

Accordingly, the undersigned concludes that the ALJ committed no error in his consideration and assessment of the state agency physician opinions as well as Claimant's other treating physicians. The ALJ's determination that Dr. Silva's November 19, 2003, RFC Assessment should be given little weight is supported by substantial evidence and should not be disturbed on appeal.

-27-

2.      ALJ's Credibility Analysis and Application of Pain Standard

Next, Claimant argues that the ALJ erred by finding that Claimant's subjective complaints concerning her impairments and the extent of their impact on her ability to do any work activities at all, were not entirely credible.  In so doing, Claimant emphasizes the marked limitations that she allegedly suffers from her impairments.

In evaluating a claimant's subjective complaints, "pain testimony should be consistent with the degree of pain that could be reasonably expected from a determinable medical abnormality." *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991).  An ALJ is required to apply a three-part pain standard when a claimant attempts to establish disability through pain or other subjective symptoms.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  This standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) evidence that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  *Id.* (citations omitted).  Thus, a claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *See id.* at 1561.  Other possible factors for consideration include the levels of medication and their effectiveness on the Claimant, the extensiveness of the attempts to obtain relief, the frequency of medical contacts, and the nature of daily activities.  *Hargis*, 945 F.2d at 1489; *see also* 20 CFR §§ 404.1529 and 416.929.

The ALJ did not conclude that Claimant's complaints of pain were invalid.  He simply found that in light of all of the other evidence, the complaints of pain were not credible with respect to the extent of their impact on her ability to do light work prior to the expiration of her insured status on

-28-

December 31, 2001. In this regard, the ALJ found that although medical evidence did support the presence of some limitations, it did not support the presence of disabling limitations as of December 31, 2001. If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility. *See Walker*, 826 F.2d at 1004. Here, the ALJ did express the reasons for his discrediting of the Claimant's testimony on pain and the ALJ's analysis did encompass the requirements of the Eleventh Circuit pain standard. It is important to note that a finding of disability requires more than the mere inability to work without pain. Rather, the relevant question is whether a claimant is credible to the extent that the described pain prevents her from performing substantial gainful activity. *See Clark v. Chater*, 75 F.3d 414, 417 (8th Cir. 1996).

Here, the ALJ highlighted discrepancies between Claimant's testimony and the information contained in documentary reports, reports in the record, the findings made on examination, and the totality of the evidence in the case, to support Claimant's subjective complaints. (Tr. 22). The ALJ concluded from the medical evidence that Claimant did experience chronic lower back pain, thus meeting the first prong of the pain standard. (Tr. 17). However, the ALJ found that none of Claimant's conditions met the requirements of either of the last two prongs of the pain test. *See Foote*, 67 F.3d at 1560. The ALJ's conclusion that the overall objective findings are not of such severity as to give rise to the immobilizing conditions and pain described by Claimant is supported by the record, which includes the medical opinions outlined above.

The ALJ complied with 20 C.F.R. § 404.1529(c)(3) and SSR 96-7p in evaluating Claimant's complaints. He considered Claimant's testimony, objective medical evidence, activities, work history, and treatment measures. (Tr. 15-24). Despite Claimant's allegations of severe pain,

neuropathy, weakness, and anxiety with functional limitations in the period prior to the date last insured of December 31, 2001, substantial evidence supports the conclusion that the medical condition was not of such a severity that it could reasonably be expected to give rise to the alleged disabling pain. Specifically, substantial evidence exists in the examination records to show a pattern of effective pain management with medication and therapy. As noted by the ALJ, Claimant reported on a number of occasions to her physicians that medication and therapy were helping her to improve or that her symptoms were decreasing in severity. (Tr. 83, 87, 88, 90). For example, Claimant reported to Dr. Averbuch on December 22, 1999, and again on January 14, 2000, that therapy was helping a great deal. (Tr. 87-88). She advised Dr. Averbuch on February 4, 2000, and May 12, 2000, that medication was helping her. (Tr. 84, 86). Likewise, in June of 2000 and in March of 2001, Claimant stated that her symptoms were not as severe as they had been previously. (Tr. 83, 115).

More significantly, and as noted above, Dr. Lesser felt that Claimant's various MRI films were not impressive, concluding that he did not clearly understand the etiology of her complaints. (Tr. 100). Similarly, Dr. Silva noted the unexplained etiology of Complainant's neuropathy in her September, 2001, medical notes as well. (Tr. 161). Additionally, Dr. Lesser's observation on February 8, 2000, that Claimant was clinically improved at that time and that further testing was not warranted is inconsistent with a finding of disabling pain. (Tr. 97). Furthermore, the conservative treatment methods utilized by Claimant's treating physicians likewise provided the ALJ with evidence that the severity of Claimant's pain was not as extreme as she testified. As noted above, her treating physicians primarily recommended ice, exercise, and flexibility training. (Tr. 84, 85, 88, 89). Even when Claimant saw neurologist Dr. Hall for a second opinion, he determined that Claimant was in "mild" distress and recommended weight and flexibility training. (Tr. 81).

-30-

Also noteworthy is the fact that as of the date of last insured, Claimant was taking Xanax (which she had taken since she was 20 years old) and continued to take it in her pre-accident dosage. (Tr. 153).  As for other medications Dr. Silva discussed non-narcotic treatment with Claimant.  (Tr. 160).  Nor did Claimant's physicians ever administer epidural blocks or cortisone shots, or prescribe narcotic drugs such as Percocet, Oxycodone, or Vicodin.  Although Claimant appears to rely on Dr. Lesser's discussion regarding surgery, a review of the medical records reveals that surgery was mentioned on one occasion only and was not pursued by either Claimant or any of her doctors, including Dr. Silva.  (Tr. 81).  One would expect various discussions or research into surgery to have taken place if Claimant was suffering from disabling pain.  Instead of such discussion or strong narcotics being prescribed, conservative treatment consisting primarily of ice and exercise was recommended.  Finally, in January of 2002, just after her date of last insured, Claimant reported to Dr. Silva that she was walking on the treadmill for 20 minutes.  (Tr. 158).

There is no indication that the ALJ did not properly apply the law in evaluating the entire body of evidence in light of inconsistencies between Claimant's testimony and other evidence in the record.  Daily activities were also properly weighed by the ALJ in evaluating Claimant's subjective complaints of pain. *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996).  Ultimately, although the ALJ found evidence of an underlying medical condition, he concluded that the objective medical evidence did  not confirm the severity of the alleged pain arising from that condition.  Further, no sufficient evidence existed that Claimant's medical condition was of such a severity that it could reasonably be expected to give rise to the severity of pain alleged by Claimant.  Because the ALJ articulated explicit and adequate reasons for discrediting Claimant's subjective pain testimony and there is substantial supporting evidence in the record to support that determination, the ALJ's finding

cannot be disturbed by this Court.  *Foote*, 67 F.3d at 1562 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986)).

### VI.   CONCLUSION & RECOMMENDATION

Claimant had a fair hearing and a full administrative consideration in accordance with the applicable statutes and regulations.  Substantial evidence supports the ALJ's findings as noted in his July 29, 2005, Notice of Decision.  For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's Motion for Summary Judgment [D.E. 8, 13] be **DENIED**, that Defendant's Motion for Summary Judgment [D.E. 11] be **GRANTED**, and that the decision of the Commissioner be **AFFIRMED**.

The parties shall have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND ORDERED** in Fort Lauderdale Florida, this 19th day of September, 2008.

ROBIN S. ROSENBAUM
United States Magistrate Judge

cc:   Honorable William P. Dimitrouleas
      counsel of record

-32-